# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––

**No. ACM 40161**

––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**George E. LOPEZ**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 7 March 2023

––––––––––––––

*Military Judge:* Shad R. Kidd.

*Sentence:* Sentence adjudged on 12 June 2021 by GCM convened at Joint Base San Antonio-Fort Sam Houston, Texas. Sentence entered by military judge on 21 July 2021 and reentered on 25 August 2021: Dishonorable discharge, confinement for 9 years and 6 months, and reduction to E-1.

*For Appellant:* Major Ryan S. Crnkovich, USAF; Major Alexandra K. Fleszar, USAF; Major Eshawn R. Rawlley, USAF; Captain Samantha P. Golseth, USAF; William E. Cassera, Esquire; Julie Caruso Haines, Esquire.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Major Morgan R. Christie, USAF; Major Allison R. Gish, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge KEY and Judge GRUEN joined.

––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

ANNEXSTAD, Judge:

At a general court-martial, a panel of officer and enlisted members convicted Appellant, contrary to his pleas, of five specifications of assault consummated by battery (Charge I); one specification of sexual assault (Charge II); and one specification of child endangerment and two specifications of kidnapping (Charge III), in violation of Articles 120, 128, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928, 934.[1] Consistent with his pleas, Appellant was found not guilty of one specification of communicating a threat (Charge III), in violation of Article 134, UCMJ.[2] The panel sentenced Appellant to a dishonorable discharge, confinement for nine years and six months, and reduction to the grade of E-1. The convening authority approved the sentence in its entirety.

Appellant raises eight issues which we have reordered and reworded: (1) whether Appellant's convictions for four specifications of assault consummated by battery (Specifications 1–4 of Charge I) and one specification of sexual assault (Specification of Charge II) are legally and factually sufficient; (2) whether the child endangerment specification (Specification 1 of Charge III) failed to state an offense; (3) whether the record of trial is substantially incomplete; (4) whether Appellant was denied the effective assistance of counsel under the Sixth Amendment;[3] (5) whether the confinement portion of Appellant's sentence is inappropriately severe; (6) whether the military judge abused his discretion by failing to give a partial lack of mental responsibility instruction with regard to the child endangerment specification; (7) whether the Government can prove beyond a reasonable doubt that the military judge's failure to instruct the panel that a guilty verdict must be unanimous was harmless; and (8) whether Appellant's conviction for child endangerment was legally and

---

[1] All references to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise indicated, all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] After findings, the military judge dismissed one specification of assault consummated by a battery (Specification 5 of Charge I), in violation of Article 128, UCMJ, as an unreasonable multiplication of charges, subject to Appellant's conviction for sexual assault (Specification of Charge II), in violation of Article 120, UCMJ, being affirmed after appellate review.

[3] U.S. CONST. amend. VI.

factually sufficient.[4] We also consider one additional issue: (9) whether Appellant is entitled to relief due to unreasonable post-trial delay.

With respect to issues (3), (6), (7), and (8), we have carefully considered Appellant's contentions and find they do not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant met AC[5] in high school and the two married in 2008. Their sons GL and NL were born in 2009 and 2011, respectively. They were 8 and 6 years old at the time of the offenses. AC's adult sister, GP, lived with the family in a single-family house located in San Antonio, Texas. On the first floor were an office and two bedrooms, one bedroom for Appellant and AC and the other for GP. The boys' rooms and a loft were located on the second floor.

The events leading to Appellant's court-martial took place around 1 January 2018. At this time, Appellant and AC were having marital problems and were discussing divorce. AC testified that at the time of the incidents she considered her marriage to be a "business-type relationship -- very distant," in which she and Appellant "fought a lot" and "mentioned divorce a lot." The two had not shared a bed for a couple of days due to an argument they had on AC's birthday.

On New Year's Eve 2017, Appellant and AC continued to argue about her birthday and other matters. Later in the evening, Appellant and GL attended a New Year's Eve party at a neighbor's house, while AC remained at home with NL, who was not feeling well. Appellant and GL returned from the party around midnight and GL went upstairs to his bedroom. AC testified she was angry that Appellant had been drinking alcohol. AC explained:

> We had made this agreement that if he was going to drink, I
> would be there because . . . when he came back from Turkey, he
> started his [Post-Traumatic Stress Disorder (PTSD)] sessions,
> and he was put on restricted work because driving triggered his
> PTSD, as well as drinking. So, I was basically the one driving

---

[4] Appellant personally raises the eighth assignment of error pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[5] By the time of trial, Appellant and AC had divorced. This opinion uses her initials at the time of trial.

around everywhere, and as far as drinking goes, we had this pact
where he would drink if I'm there.

AC then testified that she threw her wedding rings at Appellant and told
him that she was "done" with the marriage. In response, Appellant left the
house but returned around 0200 on 1 January 2018, at which point the couple
continued to argue. AC testified she left the house and "took a drive around the
block" as an attempt to deescalate the situation, but Appellant was gone when
she returned home. AC described being worried because she did not know
where Appellant was, so she attempted to find him by calling his phone, the
neighbor's phone, looking around the house, and driving around the neighbor-
hood. Appellant returned to the house around 0615. AC was still awake, GP
had just left for work, and the boys were asleep. NL slept in AC's bedroom on
the floor that night, as he was sick.

The couple continued to argue. Exhausted from being awake all night, AC
stated she eventually went to her bedroom to try and get some sleep. Appellant
came into the bedroom a short while later as AC was lying in bed and asked
her for her cell phone. Appellant became upset because AC had changed the
password to unlock her cell phone. She testified that Appellant started yelling
at her "like a drill sergeant" and "the next thing [she] kn[e]w" he was on top of
her with "his legs wrapped around [her] so he was squeezing [her] with his
legs" on her "abdomen" and "choking [her] with his arm" at the same time. AC
explained that Appellant practiced ju-jitsu and likened the episode to a ju-jitsu
"arm choke." AC stated she felt pain while this was happening because Appel-
lant was squeezing her ribs with his legs and her throat with his arm, and she
felt like she could not breathe. She described trying to gasp for air and being
in disbelief that it was happening. AC testified Appellant finally stopped after
approximately 15 seconds because NL woke up and started crying. Appellant
told NL he was just "playing with mommy, and to go back to sleep," but in-
structed AC to stay on the bed.

Appellant also remained in the bedroom and said they were going to have
a "family meeting," so AC could "feel and learn the pain [she has] caused him
over the years." AC then described how Appellant began to order her around.
She stated Appellant yelled at her to sit at various places in the room but if
she did not move fast enough or go to the correct place, he would charge at her,
grab her, and "body slam" her to the floor with his hands. She indicated that
this happened multiple times. After some time, AC asked Appellant "why are
you doing this," but their son GL entered the bedroom before Appellant could
respond. After GL entered the room, Appellant locked the bedroom door and
told GL that they were "having a family meeting." AC testified Appellant then
answered her question, stating "that's a good question. I'm not really sure, but
how does murder/suicide sound to you?" AC asked Appellant to consider the

boys, but he replied "[O]h, it doesn't matter. They're little. They won't remember this anyway."

Appellant took AC's phone and the boys' iPads and moved the electronics to the first-floor office. AC testified Appellant pulled the Wi-Fi cord out of the wall while in the office. When Appellant returned, AC began to plead with him to leave, and reminded him that he was close to retirement. She stated it appeared that Appellant was going to leave, when suddenly he "snapped," pushed her to the bed, and strangled her from behind. AC described how GL, who was now crying, asked Appellant to stop. Appellant did, and then sat in the corner of the bedroom. AC then asked to go to the bathroom, but Appellant told her that she could "just pee on [her]self or pee on the bed and that it didn't matter because [she] w[as]n't going to make it out that day."

NL was able to escape the bedroom at some point, but Appellant ran after him, brought him back into the room, and warned him not to leave again or else he would get physical with him. AC testified that Appellant continued to order her around, telling her to "[s]it here. No, don't sit there. Sit there," and that he "body slammed" her when he thought she was not complying. She also stated Appellant continued to tell the boys that he was "playing with mom" but she pleaded with the boys to leave the room, openly disputing Appellant's statement by saying things like "[n]o, he's not playing with me. He's hurting mommy." Both boys fled the room and Appellant chased them—at which point AC escaped the room, went to the backyard in her pajamas, and screamed for help. AC testified that Appellant found her in the backyard, grabbed her hair, and shoved her towards the fence—causing her to hit the fence with the side of her face and fall to the ground. She then described how Appellant grabbed her, carried her to the living room, punched her in the face twice, and directed her back to the bedroom.

Appellant then brought both boys back to the bedroom. AC stated that GL was "shaking and crying" while Appellant was drinking water and yelling at her not to tell the boys to leave or he would get physical with them. As Appellant was yelling at AC, he vomited on her and refused to allow her to change clothes. AC testified Appellant then told her that he was "suddenly curiously aroused," and told the boys to go into the closet. They complied.

After putting the boys in the closet, Appellant proceeded to get on top of AC and ordered her to kiss him. When she refused, he "slapp[ed her] around." AC testified she tried moving around to get Appellant off her but Appellant continued trying to kiss her and remove her pajama pants. AC testified that she told Appellant "[n]o" and "[y]ou don't have my permission." As she was trying to push Appellant off, he pinned her down and told her that if she kept fighting him, "he was going to start throwing punches again." She then described how Appellant got off her, took off his pants, and told her "[w]e're not going to have

sex how we typically have sex." Appellant then pulled AC's pants off and un-successfully attempted to have anal sex with her, something they had never done before. She testified Appellant penetrated her vagina with his penis until he ejaculated in her vagina. After Appellant ejaculated, he dressed himself and AC. AC asked if she could take a shower but Appellant told her no.

AC testified at this point she was scared and really thought Appellant was going to kill her and himself. After being released from the closet by Appellant, the boys joined AC on the bed. According to AC, Appellant was frustrated the boys were asking questions and kept referring to a "family meeting"—causing AC to fear that Appellant was going to harm them. AC then described trying to open the bedroom window to escape, but Appellant "smack[ed] her arms" and asked if she needed "a reminder again of who's in charge." Appellant then grabbed AC, threw her on the bed, and again strangled her with his arm in the same manner as he had earlier.

Appellant, AC, and the boys went to the kitchen around 1500 hours. AC's sister, GP, returned from work while Appellant was cooking food. Appellant asked for GP's cell phone as soon as she walked into the house. GP complied, and asked AC if something was wrong. Sensing something was not right, GP attempted to leave the house, but Appellant grabbed her and "body slammed" her to the floor before she could exit. AC stated that GP was "screaming," "in shock," and was "really emotional and scared." Appellant then instructed AC and GP to sit on bar stools in the kitchen. Appellant returned to cooking food and told GP that they were going to have a "family meeting." At Appellant's court-martial, AC explained that Appellant was holding a kitchen knife in his hand to cut meat and was "kind of taunting [them] with the knife." Over the next several hours, Appellant continued to mention a murder/suicide plan, restrict everyone's phone access, and refused to allow anyone to leave.

Around 1800 hours, Appellant began making phone calls to his mother and his brother, at which time he allowed GP to go upstairs with the boys. Shortly thereafter, Appellant took prescription muscle relaxers in a suicide attempt. Appellant told his mother "he had done some really bad things to [AC], and that he was probably going to jail." Appellant's brother, EL, testified that he received a phone call from Appellant late that afternoon—Pacific Standard Time—during which Appellant talked about suicide and "going to jail for 20 years." EL also stated that AC interrupted the call and told Appellant to vomit; EL described hearing Appellant vomit. Appellant eventually gave AC her phone and she immediately called 911 at 1835 hours.

Deputy PM and Deputy DP of the Bexar County Sheriff's Office responded to the 911 call. When they arrived at Appellant's house they found him talking on his cell phone outside near his home. Deputy PM exited the patrol car, Appellant ended his phone call, and Deputy PM asked Appellant, "What's going

on?" According to the deputies, Appellant stated he "did it" and he "did some cruel and unusual things." Deputy PM asked Appellant if he assaulted and sexually assaulted his wife to which Appellant replied "yes." After Deputy PM detained Appellant and placed him in the police car, he entered the house where he found AC "crying" and "terrified." Another law enforcement officer, Patrol Sergeant AV, testified that when she made contact with AC in the house she was "distraught, very emotional."

The deputies took photographs of AC's injuries. AC had a cut lip from being shoved into the fence earlier, her lip and eyes were slightly swollen, and she had a scratch on her foot from running in the backyard shoeless while calling for help. With regard to GP, the deputies observed her in obvious discomfort due to a leg injury. Deputy PM stated Appellant, AC, GP, and the boys were taken to a local medical center for evaluation.

While at the medical center, a sexual assault forensic examination was conducted on Appellant and on AC. During trial, an expert testified Appellant's DNA was found in and around AC's vagina and underwear, and AC's DNA was found on Appellant's penis.

At trial, AC and both boys testified Appellant "locked" them in the bedroom. GL also testified he witnessed Appellant on top of AC, choke her in the bedroom, punch her, push her, "body slam" her, and vomit on her—all on the day relevant to the charged offenses. He described for the members that Appellant yelled and "cussed" at AC while this was happening. GL also remembered AC running to the backyard and Appellant chasing her down. He confirmed Appellant kept talking about a "family meeting" and that Appellant instructed both him and his brother to get in the closet. GL described being scared, shocked, and confused the entire day.

The Government also presented testimony from a digital forensics expert who reviewed AC's phone records. The expert described a complete lack of phone activity for the entire day on 1 January 2018, until AC made the 911 call at 1835. Additionally, the Government offered testimony and health records from the medical exams conducted on AC and GP following the incidents. The records detailed that AC had bruising on both arms, which was confirmed by testimony as consistent with being grabbed. The records also detailed that GP had bruising on her right outer hip and on the left side of her lower back. At trial, the Government also introduced interviews from both boys which were conducted by investigators of the local Texas Department of Family and Protective Services Agency (DFPS) within days of the incident. During one interview, GL told DFPS he saw Appellant "hitting, punching; cussing [his] mom out" and "[b]ody slamming her." During another interview, NL told DFPS that Appellant locked him, his brother, and AC in a room, and that the police came

to the house because Appellant "was almost going to kill [his] mom. Because [Appellant] was going to kill [his] mom."

The panel of officer and enlisted members found Appellant guilty of five specifications of assault consummated by a battery, one specification of sexual assault, one specification of child endangerment, and two specifications of kidnapping.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant contends that the evidence is legally and factually insufficient to support the findings of guilty on the first four specifications of the assault charge and the sexual assault charge. Specifically, Appellant argues: (1) AC was not a credible witness; (2) AC gave inconsistent accounts of the incidents; (3) AC only agreed to testify after she learned "she could get money from the state government;" (4) the physical evidence did not support the findings; (5) Deputy DP did not hear Appellant say he did "cruel and unusual things" to AC; and (6) the investigation was flawed. We are not persuaded by any of Appellant's contentions and find that no relief is warranted.

#### 1. Law

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019). The test for legal sufficiency "gives full play to the responsibility

of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (internal quotation marks omitted) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

In order to find Appellant guilty of assault consummated by battery, in violation of Article 128, UCMJ, as alleged in Specifications 1 through 4 of Charge I, the panel members were required to find the following two elements beyond a reasonable doubt: (1) that Appellant did bodily harm to AC at or near San Antonio, Texas, on or about 1 January 2018; and (2) that the bodily harm was done with unlawful force or violence. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 54.b.(2). Specification 1 alleged that on divers occasions Appellant unlawfully strangled AC on the neck with his forearm.[6] Specification 2 alleged that Appellant unlawfully grabbed and pushed AC down to the ground with his hands. Specification 3 alleged that Appellant unlawfully pushed AC on the head with his hand. Specification 4 alleged that, on divers occasions, Appellant unlawfully struck AC in the face with his hand.

In order to find Appellant guilty of sexual assault, in violation of Article 120, UCMJ, as alleged, the panel members were required to find the following beyond a reasonable doubt: (1) that at or near San Antonio, Texas, on or about 1 January 2018, Appellant committed a sexual act upon AC by penetrating AC's vulva with his penis; and (2) that Appellant did so by causing bodily harm to AC by penetrating AC's vulva with his penis without AC's consent. *See* 2016 *MCM*, pt. IV, ¶ 45.b.(3)(b).

---

[6] The panel members excepted the word "forearm" and substituted the words "upper extremity" and found Appellant not guilty of the excepted word and guilty of the substituted words.

Article 120, UCMJ, explains consent as:

> a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social [relationship] . . . by itself . . . shall not constitute consent.

10 U.S.C. § 920(g)(8)(A).

**2. Analysis**

Our review finds that the Government introduced convincing evidence for a rational factfinder to find Appellant guilty of assaulting and sexually assaulting AC beyond a reasonable doubt. Most significant was the testimony of AC who described with clarity the almost 12-hour incident on 1 January 2018. She described, in detail, how Appellant used a ju-jitsu "arm choke" to strangle her on three occasions, grabbed her, "body slammed" her to the floor, and pushed her on her head with his hands. AC also testified that Appellant forcefully penetrated her vulva with his penis without her consent until he ejaculated. We find AC's testimony sufficient, without additional evidence, to support the charged offenses. As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to credibly testify. *See United States v. Rodriguez-Rivera,* 63 M.J. 372, 383 (C.A.A.F. 2006) (explaining testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt).

That stated, we also find that AC's testimony was sufficiently supported by the physical evidence introduced at trial. First, we note evidence showed Appellant's DNA was present in and around AC's vagina and her underwear, and AC's DNA was present on Appellant's penis. This evidence specifically supports AC's testimony that she was sexually assaulted. Second, the Government presented the medical records from the exams conducted on both AC and GP following the events on 1 January 2018. These medical reports detail numerous injuries on both women that were consistent with the assaults described by AC and GP at trial. Furthermore, the Government supported AC's testimony with phone records that showed that AC did not use her phone from approximately 0600 hours until she called 911 at 1835 hours on the day of the incident. Finally, we note that the testimony from GL, NL, and GP corroborated most, if not all, of the testimony provided by AC.

We also note that Appellant's own inculpatory statements to the deputies, and his expressions of consciousness of guilt to his mother and brother, generally support AC's testimony at trial. Here the record details that Appellant told

the detectives he "did it," and he "did cruel and unusual things" while confirming to the detectives that he assaulted and sexually assaulted AC. Furthermore, the record also demonstrated that Appellant told his mother "he had done some really bad things to [AC], and that he was probably going to jail." Finally, Appellant's brother testified Appellant told him that he was "going to jail for 20 years."

As at trial, Appellant again questions AC's credibility and motives, and highlights a number of inconsistencies in her description of the assaults during the subsequent investigation. We address Appellant's most significant arguments below.

First, Appellant argues that AC was not a credible witness because she continued to carry on a relationship with Appellant for months following the events of 1 January 2018. Appellant contends because of this she must have fabricated the allegations. AC addressed her post-assault decisions during trial, and explained that in the nine years leading up to 1 January 2018, Appellant was never abusive to her and that she tried to reconcile with Appellant out of love and the family that they created together. We find that a rational factfinder could reasonably conclude AC's decision to continue a relationship with her husband despite the physical and sexual abuse did not materially undermine her trial testimony.

As for her motives to testify, Appellant contends AC only agreed to testify against Appellant after she learned that she could be compensated for participating in Appellant's trial through a state crime-victim compensation program. We again find a rational factfinder could reasonably conclude that this potential motive did not materially undermine AC's trial testimony. Specifically, we note there was evidence presented at trial that demonstrated AC immediately called 911 when she had the chance and immediately identified Appellant as the perpetrator. Furthermore, the record demonstrates that AC was "distraught," "very emotional," "crying," and "frantic" when the detectives arrived at the house.

Finally, Appellant argues that AC's trial testimony differed from what she told the police and the family advocacy personnel. For example, Appellant contends that AC gave different accounts about where she was when Appellant took her cell phone, about where Appellant placed her phone and the boys' devices, and about where she was when the sexual assault occurred. We find that a rational factfinder could reasonably find that the examples cited by Appellant were relatively insignificant, especially when considered in conjunction with AC's detailed testimony, the testimony from other eyewitnesses, including GL, NL, and GP, the physical evidence presented at trial, and Appellant's own admissions which all generally corroborate AC's testimony.

We conclude that viewing the evidence produced at trial in the light most favorable to the Prosecution, a rational trier of fact could have found the essential elements of assault consummated by battery and sexual assault beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41.

## B. Failure to State an Offense

Appellant contends that the child endangerment specification failed to state an offense. Specifically, Appellant argues the specification, as drafted, did not specify whether the alleged child endangerment was by design or culpable negligence. Appellant asks that we dismiss the specification and reassess his sentence. We find no prejudice to Appellant and conclude that no relief is warranted.

### 1. Additional Background

Specification 1 of Charge III alleged a child endangerment offense in violation of Article 134, UCMJ. The specification reads that Appellant,

> at or near San Antonio, Texas, on or about 1 January 2018, was responsible for the care of his two sons, [GL] and [NL], children under the age of 16 years, and did endanger their welfare by locking them in a room while he assaulted their mother, [AC], in their presence, and that such conduct was of a nature to bring discredit upon the armed forces.

In order to find Appellant guilty of child endangerment, in violation of Article 134, UCMJ, as alleged, the panel members were required to find the following four elements beyond a reasonable doubt: (1) that at or near San Antonio, Texas, on or about 1 January 2018, Appellant had a duty for the care of his two sons, GL and NL; (2) that GL and NL were under the age of 16 years; (3) that Appellant endangered GL and NL's welfare through *culpable negligence* by locking them in a room while he assaulted AC, in their presence; and (4) that under the circumstances, such conduct was of a nature to bring discredit upon the armed forces. *See* 2016 *MCM*, pt. IV, ¶ 68a.b.

On 14 January 2021, Appellant's trial defense counsel requested a bill of particulars from the Government seeking clarification on, *inter alia,* "[w]hen is the alleged child endangerment in relation to the alleged sexual assault?" The Government provided the following:

> The child endangerment begins when [Appellant] puts the children in the bedroom and keeps them their [sic] against their will. This is evidenced by [GL]'s fear and desire to call 911 and [NL]'s

action of running outside to the neighbors to get help. The child endangerment continued through to when [Appellant] put the boys in the closet while he sexually assaulted AC. It continued during Charge I, Spec[ification] 6, when [Appellant] grabbed and pushed [GP] to the ground in front of the boys.

In response to another question in the bill of particulars request positing "[w]hat act or acts of assault are alleged as part of effectuating the charged child endangerment," the Government responded, "Charge I, Specifications 1, 2, 4, and 5."

The Government provided proposed instructions to the Defense on 31 May 2021 pursuant to the military judge's scheduling order. Appellant's trial defense counsel returned the proposed instructions to the Government with "thoughts and edits." The proposed instructions made clear the Government believed that Appellant's offense was a culpable negligence crime and not a crime by design. The Government then filed the proposed instructions with the military judge. During an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session on 7 June 2021, Appellant's trial defense counsel objected to the proposed instructions and moved to dismiss the child endangerment specification for failure to state an offense because the specification did not specifically allege a *mens rea*. The Defense argued that the specification failed to provide proper notice to Appellant as to whether he needed to defend against a *mens rea* under a culpable negligence theory or to defend against a *mens rea* under a "by design" theory. Appellant's trial defense counsel further argued the *mens rea* is an element of the offense that must be specifically charged, and the Government's omission of the element prejudiced Appellant insofar as it raised double jeopardy concerns. In essence, the Defense argued that by not specifically charging Appellant with committing the offense by culpable negligence, he could be tried at some future date for the same offense under a "by design" theory.

The Government opposed the motion, arguing both the Government's answer to the Defense's bill of particulars request and the proposed instructions made clear that the Government was proceeding on the *mens rea* of culpable negligence. The Government added there was no prejudice to Appellant because the maximum sentence for child endangerment by culpable negligence was much lower than the maximum sentence for child endangerment by design. Finally, the Government argued that child endangerment by culpable negligence is a general intent crime and, therefore, the *mens rea* was necessarily implied.

The military judge denied Appellant's motion to dismiss the specification for failure to state an offense. The military judge concluded that the child endangerment specification: (1) alleged every element of the offense "expressly or by necessary implication;" (2) "include[d] the essential elements of the offense;"

(3) provided notice of the offense; and (4) protected Appellant "against double jeopardy for child endangerment by culpable negligence against his sons by assaulting their mother in their presence." Trial defense counsel did not request reconsideration, and conceded, "I think culpable negligence would seem to be the appropriate *mens rea.*"

Subsequently, the military judge instructed the members that the third element of child endangerment, in violation of Article 134, UCMJ, was that Appellant "endangered [GL's and NL's] welfare through culpable negligence by locking them in a room while he assaulted their mother, [AC], in their presence." The military judge also provided a definition of culpable negligence.

**2. Law**

Whether a specification states an offense is a question of law that we review de novo. *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012).

The Sixth Amendment requires that an accused "be informed of the nature and cause of the accusation against him." *United States v. Turner*, 79 M.J. 401, 403 (C.A.A.F. 2020) (internal quotation marks omitted) (quoting U.S. CONST. amend. VI).

"[T]he Fifth Amendment[7] provides that no person shall be deprived of life, liberty, or property, without due process of law, and no person shall be subject for the same offen[s]e to be twice put in jeopardy." *Id.* (internal quotation marks omitted) (quoting U.S. CONST. amend. V).

> [W]hen an accused servicemember is charged with an offense at court-martial, each specification will be found constitutionally sufficient only if it alleges, either expressly or by necessary implication, every element of the offense, so as to give the accused notice [of the charge against which he must defend] and protect him against double jeopardy.

*Id.* (second alteration in original) (internal quotation marks omitted) (quoting *United States v. Dear*, 40 M.J. 196, 197 (C.M.A. 1994)).

"[W]hen [a] charge and specification are first challenged at trial we read the wording . . . narrowly and will only adopt interpretations that hew closely to the plain text." *Id.* (alterations and omission in original) (emphasis omitted) (quoting *United States v. Fosler,* 70 M.J. 225, 230 (C.A.A.F. 2011). Therefore, "we will consider only the language contained in the specification when deciding whether it properly states the offense." *Id.* (citing *United States v. Sutton,* 68 M.J. 455 (C.A.A.F. 2010)).

---

[7] U.S. CONST. amend. V.

"If a specification fails to state an offense, the appropriate remedy is dismissal of that specification unless the Government can demonstrate that this constitutional error was harmless beyond a reasonable doubt." *Id.* at 403–04 (citing *United States v. Humphries*, 71 M.J. 209, 213 n.5 (C.A.A.F. 2012)).

### 3. Analysis

We need not determine whether the child endangerment specification at issue failed to state an offense because Appellant did not suffer any prejudice— "even when the stringent constitutional standard of harmlessness beyond a reasonable doubt is applied." *Id.* at 407 (citing *Humphries*, 71 M.J. at 213 n.5).

Here, the record demonstrates that trial defense counsel requested a bill of particulars on the same day charges were preferred. Specifically concerning the offense of child endangerment, trial defense counsel did not seek clarification on whether the Government charged Appellant with child endangerment by culpable negligence or design. On the contrary, the only information trial defense counsel requested with respect to this charge concerned the "act or acts" that constituted the offense. The record shows trial defense counsel did not raise the issue of *mens rea* until just prior to Appellant's entry of pleas.

The record also demonstrates Appellant was on actual notice of the Government's *mens rea* theory of culpable negligence as early as 31 May 2021. Here, the Government's proposed instructions, which were submitted seven days before the start of the trial, clearly indicated that the Government was pursuing the *mens rea* of culpable negligence. Subsequently, the Government reiterated its position that it believed "this is a culpable negligence crime and not a crime by design" on the first day of trial and prior to the entry of pleas. The trial counsel also later confirmed: "The [G]overnment views this and anticipates the facts will present themselves as a culpable negligent [sic] theory, and the [G]overnment does not have any evidence that this was the greater offense of by design." We note that after trial defense counsel moved to dismiss the specification for failure to state an offense, they did not request a ruling from the military judge on the motion prior to presentation of evidence or disagree with Government's assertion. Accordingly, the military judge issued his ruling after the Government had rested their case on the fourth day of trial. We also note that after the military judge issued his ruling, trial defense counsel did not request reconsideration, and conceded, "I think culpable negligence would seem to be the appropriate *mens rea*."

Additionally, we note the military judge provided findings instructions which informed the members that the third element of the child endangerment specification was Appellant "endangered [GL's and NL's] welfare through culpable negligence by locking them in a room while he assaulted their mother, [AC], in their presence." The military judge then provided the members with a

definition of culpable negligence. The record also demonstrates trial counsel argued Appellant's culpable disregard for his sons' welfare during closing argument:

> He endangered their welfare through culpable negligence by locking them in a room and assaulting their mother within their presence. They told you about needing to get out and get help. They even told you about running to get help. They knew it was not right . . . . This is child endangerment.

We find the record void of any instance where trial defense counsel appears misled, or discussed, presented, or argued to the members the specific intent offense of child endangerment by design.

When we consider the facts of this case, we find no basis to conclude Appellant would have handled his defense any differently, the result of the court-martial would have been different, or that Appellant would have been provided any additional protection against double jeopardy if the Government had specifically listed "culpable negligence" in the specification on the charge sheet. In fact, Appellant did not allege in his assignments of error brief to this court that he would have done anything differently, has not pointed to any alterations in strategy or to different defenses he would have raised, and did not suggest it affected the way the Defense approached his case. Finally, we conclude that Appellant was sufficiently protected against double jeopardy for two reasons: (1) the gravamen of the child endangerment is already captured by Appellant's conviction; and (2) Appellant cannot be tried again for the same conduct because child endangerment by culpable negligence is a lesser-included offense of child endangerment by design. *See United States v. Rice,* 80 M.J. 36, 44 (C.A.A.F. 2020) ("Whatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense."; *see also United States v. Hudson,* 59 M.J. 357, 358 (C.A.A.F. 2004) ("The Fifth Amendment protection against double jeopardy provides that an accused cannot be convicted of both an offense and a lesser-included offense." (Citations omitted).). Accordingly, we find Appellant suffered no prejudice and conclude that any error in the drafting of the specification was harmless beyond a reasonable doubt.

## C. Claim of Ineffective Assistance of Counsel

Appellant contends he received ineffective assistance from his trial defense counsel. Specifically, Appellant asserts his counsel were deficient in that they: (1) failed to retain an expert consultant in PTSD and failed to offer any evidence of Appellant's PTSD diagnosis either during trial or sentencing proceedings; (2) failed to investigate and litigate whether AC waived her attorney-client privilege with her special victims' counsel (SVC); (3) failed to argue for an

instruction on partial lack of mental responsibility, and therefore waived it; and (4) failed to present evidence during sentencing proceedings of Appellant's loss of retirement.[8] Appellant requests that we set aside and dismiss the findings. We disagree with Appellant's contention that he received ineffective assistance of counsel and find no relief is warranted.

### 1. Additional Background

On 21 December 2022, we ordered Appellant's trial defense counsel, Major (Maj) AA and Captain (Capt) TO, to provide responsive declarations to address Appellant's ineffective assistance of counsel claims.[9] We have also considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense team's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay,* 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam). We find a hearing unnecessary to resolve Appellant's claims.

### 2. Law

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

---

[8] Appellant also advances a cumulative error argument and cites to a memorandum from one of Appellant's trial defense counsel, Captain (Capt) TO, which was included with Appellant's clemency submission. In the memorandum, Capt TO suggested that some of her decisions might now be viewed as "deficient" and "prejudicial" to Appellant. We do not read this clemency submission as an admission of deficient performance, but rather an introspective look on the trial itself, which as she wrote are always "ripe for reflection." We note this conclusion is supported by declarations submitted by both trial defense counsel to this court which rebut Appellant's claims that they were ineffective and provided deficient performance. Therefore, Appellant is not entitled to any relief under the cumulative error argument.

[9] Because the issue was raised in the record but was not fully resolvable by those materials, we may consider the declarations submitted by trial defense counsel consistent with *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id*. (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on an appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). An appellant overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). This also applies to trial defense counsel's strategic decisions. *Morgan*, 37 M.J. at 410. "[S]trategic choices made by trial defense counsel are virtually unchallengeable after thorough investigation of the law and the facts relevant to the plausible options." *Akbar*, 74 M.J. at 371 (internal quotation marks and citation omitted.)

In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*,

466 U.S. at 689. Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

### 3. Analysis

#### a. PTSD

Appellant first claims that his trial defense counsel were ineffective by failing to retain an expert consultant in PTSD. We find Appellant's contention is not supported by the record. On 14 January 2021, trial defense counsel requested the convening authority appoint Dr. KG, a board-certified forensic psychologist. Maj AA's declaration stated that request specifically identified Appellant's "severe PTSD and combat[-]related mental health issues" as bases for the expert request. Subsequently, the convening authority approved the request. Maj AA provided that Dr. KG "spoke fluently" on the topic of PTSD. Since this portion of Appellant's claim is not supported by the record, we find no basis to support Appellant's claim that his trial defense counsel were ineffective for failing to retain an expert consultant in PTSD.

Next, Appellant argues his trial defense counsel were deficient for not introducing evidence of his PTSD in findings "to rebut evidence that Appellant had the specific intent necessary for the child endangerment specification." Here, Appellant was charged with child endangerment by culpable negligence, which is a general intent offense. Therefore, as charged, the defense of partial mental responsibility was not available to Appellant. *See United States v. Handy*, 48 M.J. 590, 593 (A.F. Ct. Crim. App. 1998) ("As for partial mental responsibility, appellant's absence offense was only a general intent crime. Consequently, the concept of partial mental responsibility was not a player for that offense.").

However, even if it were an available defense, Appellant's trial defense counsel provided reasonable explanations for their decision not to present evidence concerning Appellant's PTSD. Maj AA stated in his declaration that they were aware of Appellant's PTSD and had reviewed 1,664 pages of Appellant's mental health records. He also stated he had access to and reviewed the "long form" report concerning Appellant's formal inquiry into his mental capacity or mental responsibility under Rule for Courts-Martial 706. Maj AA also described multiple discussions with Dr. KG between 12 March 2020 and 12 January 2021 regarding the possibility of introducing evidence of Appellant's PTSD during trial. He stated Dr. KG firmly advised him to "avoid introducing evidence that would result in production of [Appellant]'s mental health records to the [P]rosecution." Maj AA also discussed that on 27 April 2021, a second inquiry concerning Appellant's mental capacity and mental responsibility was conducted at his request, and that he also shared those results with Dr. KG

and asked for Dr. KG's advice and recommendation with regard to the results. According to Maj AA, Dr. KG responded consistently with her advice to avoid introducing evidence of Appellant's PTSD at trial:

> I want to reiterate I do not recommend doing anything that would place [Appellant's] mental health records in the [G]overnment's hands. Aside from uncharged conduct and inconsistent statements in general; he provided some inconsistent statements upon which the PTSD diagnosis was based. Whether he has PTSD or not, his records/diagnosis does not explain or mitigate sexual assault or the alleged violence.

Maj AA confirmed that Dr. KG's advice informed the Defense's trial strategy to which Capt TO agreed, particularly with the decision to not introduce evidence of Appellant's PTSD.

We find Appellant has failed to either meet his burden of showing deficient performance or overcome the strong presumption that his trial defense counsel's performance was within the wide range of reasonable professional assistance. Both trial defense counsel provided reasonable explanations for their actions, and their individual and combined level of advocacy on Appellant's behalf was not "measurably below the performance ordinarily expected of fallible lawyers." *Polk*, 32 M.J. at 153. Furthermore, we find both trial defense counsel have articulated strategic reasons for their decisions concerning evidence of Appellant's PTSD. We will not second guess their defense strategy and note that we evaluate defense counsel's performance not by the success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *See Dewrell*, 55 M.J. at 136 (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998)). The declarations submitted by Appellant's trial defense counsel make clear that the defense team sought to shape the facts and narrative in the light most favorable to Appellant. Based on our review of the record, to include evidence and the declarations of defense counsel, the defense team was somewhat successful in this regard.

Next Appellant claims his trial defense counsel were deficient for failing to introduce evidence of his PTSD in sentencing. We find this claim is also not supported by the record. The record shows Appellant adequately addressed his PTSD in his unsworn statement. He vividly detailed his time in Iraq, where he witnessed and experienced improvised explosive device explosions and other "traumatic" events while deployed. Appellant also discussed his "deep sadness," "nightmares," crying, and a suicide attempt resulting from his post-deployment struggles. Thus, the record clearly shows Appellant's PTSD was introduced during sentencing.

Additionally, the declarations submitted by Appellant's trial defense counsel show that their decision not to present evidence through expert testimony or mental health records was an objectively reasonable, strategic decision. Presenting such evidence would have enabled the Government to rebut Appellant's diagnosis with potentially damaging inconsistent statements with regard to his PTSD, as well as open the door to uncharged misconduct. We find trial defense counsel's strategic approach leveraged the potential mitigation of Appellant's traumatic experiences, including his post-deployment mental health struggles, while mitigating the possibility that the Government would put on evidence which could have severely undermined Appellant's credibility, claims of PTSD, and remorse. Therefore, we find these strategic decisions to be reasonable.

### b. AC's Attorney-Client Privilege

Appellant argues trial defense counsel were deficient by failing to investigate and litigate AC's potential waiver of attorney-client privilege with her SVC. In support of this claim, Appellant highlights the following portion of the record where trial defense counsel questioned AC on an admission that Appellant potentially made concerning the charged offenses:

> [Trial Defense Counsel (TDC)]: Okay. And when you got divorced, you hadn't shared those admissions by [Appellant] with any prosecutors or law enforcement representatives, is that correct?
>
> [AC]: When I got divorced?
>
> [TDC]: Yeah.
>
> [AC]: I did.
>
> [TDC]: Oh you did. Who?
>
> [AC]: I believe it was my SVC.

Appellant claims his trial defense counsel were deficient for not seeking to have AC's SVC testify about her conversations with AC. Appellant now speculates if the military judge agreed that AC waived the privilege, then the SVC's testimony might have been inconsistent with AC's testimony and, if it was inconsistent, it could have weakened AC's credibility.

In response to this claim, Maj AA's declaration provided that he did not attempt to pierce AC's attorney-client privilege by having her SVC testify for two guiding reasons. First, Maj AA did not know how AC's SVC would testify. He was concerned that if the SVC was called as a witness and confirmed the conversation, it would be another consistent statement—bolstering AC's testimony and strengthening the Government's case. Second, he explained that his

strategy on cross-examining AC on this topic was "to undermine the weight of [Appellant's] admissions by making them appear to be a fabrication tied to [AC's] motive to fabricate" after she had moved on to another relationship.

"[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate conduct from counsel's perspective at the time.'" *Akbar*, 74 M.J. at 379 (omission in original) (quoting *Strickland*, 466 U.S. at 689). Again, we do not find Appellant has overcome the presumption of competence. Appellant has not demonstrated that testimony from AC's SVC would have been helpful. In fact, we find that Appellant's argument on appeal is built on nothing more than supposition. As we have discussed, *supra*, Appellant's trial defense counsel generally attacked AC's credibility throughout trial. Maj AA's strategy with regard to his cross-examination of AC was reasonable, as was his decision to not challenge AC's attorney-client privilege with her SVC. Trial defense counsel's performance was not measurably below the performance ordinarily expected of fallible defense counsel. *See Polk*, 32 M.J. at 153.

### c. Partial Mental Responsibility Instruction

Appellant further asserts that trial defense counsel were deficient for failing to argue for an instruction on partial mental responsibility, and therefore waiving it. The record reflects both parties were asked, during a discussion on potential instructions, whether an instruction on lack of partial mental responsibly was applicable to Appellant's court-martial. Trial counsel argued the instruction did not apply because the instruction is only applicable to specific intent crimes and Appellant was charged with general intent offenses. Trial defense counsel, as he stated in his declaration, did not believe he had "a colorable legal argument" for the instruction after reviewing relevant case law. Trial defense counsel also stated he wanted the court to "make its own determination" and he desired to "maintain candor with the [c]ourt."

Ultimately, the military judge did not provide an instruction on partial mental responsibility. The record shows the military judge and counsel for both sides engaged in a discussion about potential instructions, all parties discussed relevant law as related to the facts of Appellant's case, and the military judge determined such an instruction was not warranted. The law does not require counsel to make futile arguments to avoid a later claim of ineffectiveness. We therefore conclude Appellant has failed to demonstrate he was entitled to the instruction or that his trial defense counsel's performance was deficient by not objecting to the proposed instructions absent a colorable argument for requesting such. We conclude that trial defense counsel's decision to waive the instruction was not measurably below the standard of fallible defense counsel. *See Polk*, 32 M.J. at 153.

### d. Loss of Retirement Benefits

Appellant asserts his counsel were ineffective for failing to present evidence of Appellant's loss of retirement benefits. Maj AA explained the Defense's decision to focus Appellant's sentencing case on emotional growth as opposed to financial loss:

> One decision that was brought up on the record was the [D]efense's decision to not introduce evidence related to retirement. The defense strategy for sentencing was to focus the trier of fact on (a) [Appellant]'s rehabilitative potential, as evinced by opinions and statements about his good deeds and duty performance, (b) his desire for a health[y] relationship with his children, and (c) his desire to get healthy. The latter was addressed, in part, by the reference to Department of Veterans Affairs in his unsworn statement. In my assessment, focusing the members on how little money and benefits [Appellant] would have in the event of his mandatory dishonorable discharge would orient the members on him being selfish, lacking perspective on the heinous acts of which he was convicted, and yield the moral high ground that we were otherwise endeavoring to keep compared to the patently selfish conduct for which we impeached [AC] throughout the trial.

(Third alteration in original).

We also note Appellant's trial defense counsel articulated on the record during presentencing that it was a deliberate choice to forego evidence specific to loss of retirement benefits. Trial defense counsel explained to the military judge there was already evidence before the members concerning Appellant's service history and that his length of service "clearly" demonstrated how "extremely close to retirement" Appellant was. Trial defense counsel then requested the military judge to provide the members an instruction concerning Appellant's loss of retirement benefits, which he did. We find the reasons given by trial defense counsel were well reasoned, well articulated, and not "conclusory, self-serving[, or] inadequate." *Polk*, 32 M.J. at 153. We conclude it was within the realm of reasonable choices to focus defense efforts highlighting Appellant's emotional growth to potentially reduce his exposure to confinement instead of the financial fallout from a punitive discharge—especially considering, as his trial defense counsel acknowledged, Appellant was not retirement eligible, he did not have an approved retirement date, Appellant's term of service had expired by the date of his court-martial, and, most compelling, a dishonorable discharge was mandatory for the offenses of which Appellant was convicted.

In conclusion, after applying the framework to address claims of ineffective assistance of counsel, we conclude that Appellant has not overcome the presumption of competence and has failed to demonstrate either deficient performance or prejudice. We find no relief is warranted.

## D. Sentence Severity

Appellant argues his sentence to nine years and six months of confinement is inappropriately severe. Specifically, Appellant contends his sentence failed to take into account his PTSD, his strong service record, his strong rehabilitative potential, the nature and seriousness of the offenses, and all the matters contained in the record. We are not persuaded by Appellant's arguments and find that the sentence is not inappropriately severe.

During presentencing the Government offered the testimony of AC's close friend, who described the effects Appellant's crimes had on AC and GL. The Government also admitted Appellant's personal data sheet, enlisted performance reports, excerpts from AC's medical records regarding treatment she received after 1 January 2018, and three pictures of GL and NL together.

The members also received unsworn victim impact statements from AC, GP, and GL. In AC's oral and written statement, she described how Appellant's actions have significantly and negatively impacted her and her sons. GP's written statement discussed how Appellant's crimes negatively affected her life. Finally, in a short 27-second video statement, GL discussed being shocked by Appellant's crimes and asked why it happened.

Appellant's robust sentencing case consisted of: (1) testimony from Appellant's first sergeant, a retired senior master sergeant, who discussed Appellant's excellent duty performance following the incident; (2) a short video of Appellant discussing his duties for certain pandemic-related measures; (3) Appellant's written unsworn statement; (4) Appellant's verbal unsworn statement; (5) character letters from colleagues and friends; (6) documentation of Appellant's awards, certificates, and achievements; and (7) photos from Appellant's time in the military. We note Appellant had served in the Air Force for over 19 years, had eight overseas tours, and had earned numerous awards and decorations during his service. We also note Appellant's sentencing case portrayed him as a capable noncommissioned officer who routinely exceeded his leadership's expectations.

In addition to a mandatory dishonorable discharge, the maximum punishment Appellant faced as a result of his convictions included, *inter alia*, confinement for life without the eligibility of parole, forfeiture of all pay and allowances, and reduction to the grade of E-1. With regard to confinement, the Government argued for ten years, and the Defense argued for no more than three years if the members determined confinement was necessary.

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2016) (citation omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). While we have discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

We have considered the nature and seriousness of the offenses and have given individualized consideration to Appellant, including his record of service and all matters contained in the record. We find that nine years and six months' confinement is not an inappropriately severe punishment for physically and sexually assaulting his wife, physically assaulting his wife's sister, and endangering the welfare of his sons. Although Appellant's adjudged sentence included a significant period of incarceration, it is far less than the maximum authorized—confinement for life—and was also less than the amount of confinement that the Government argued was appropriate. Although we have broad discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *Id.* After careful consideration of the above and the matters contained in the record of trial, we conclude the sentence is not inappropriately severe.

## E. Appellate Review Delay

Appellant's court-martial concluded on 12 June 2021, and the record of trial was not docketed with this court until 1 September 2021. This court is issuing its opinion in 18 months and about one week after docketing.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay where the Court of Criminal Appeals does not issue its decision within 18 months of docketing. Where there is such a facially unreasonable delay, we consider the four factors identified in *Barker v. Wingo*, 407 U.S. 514, 530 (1972), to assess whether Appellant's due process right to timely post-trial and appellate review has been violated: "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135

(citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)).

However, where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three interests protected by an appellant's due process right to timely post-trial review: (1) preventing oppressive incarceration; (2) minimizing anxiety and concern; and (3) avoiding impairment of the appellant's grounds for appeal and ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

The delay between docketing at this court and the issuance of this opinion exceeds *Moreno's* 18-month threshold for a facially unreasonable appellate delay. *Id.* However, Appellant has not claimed prejudice from the delay, and in light of *Moreno* we find none. Where the appellant does not prevail on the substantive grounds of his appeal, as in this case, there is no oppressive incarceration. *Id.* at 139. We discern no impairment to Appellant's grounds for appeal, and where an appellant's substantive appeal fails, his ability to present a defense at a rehearing is not impaired. *Id.* at 140. With regard to anxiety and concern, "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* Appellant has made no such showing of particularized anxiety, and we perceive none.

Accordingly, the question becomes whether the delays in this case were so egregious as to adversely affect the public's perception of the military justice system. *Toohey*, 63 M.J. at 362. We conclude it was not. Here, the facially unreasonable appellate delay was relatively slight—just about one week.

Finally, recognizing our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), we have also considered whether relief for excessive post-trial delay is appropriate in this case even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude no such relief is warranted.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred.

Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court